# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SCI TECHNOLOGY, INC., et al., | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| v. | } | **Case No.:  5:03-CV-1931-RDP** |
| | } | |
| C & D TECHNOLOGIES, INC., | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before this court are Plaintiffs SCI Technology, Inc. ("SCI Tech") and Sanmina-SCI Systems Limited's ("Sanmina") (Plaintiffs SCI Tech and Sanmina are sometimes collectively referred to herein as "SCI") Motion for Summary Judgment (Doc. #53) filed on June 16, 2005, and Defendant C & D Technologies, Inc.'s ("C & D") Motion for Summary Judgment (Doc. #54) filed on June 17, 2005.  C & D filed its responsive submission (Doc. #32) on August 23, 2004, and SCI filed its reply (Doc. #47) on September 7, 2004.  SCI filed its responsive submission (Doc #35) on August 23, 2004, and C & D filed its reply (Doc. #42) on September 2, 2004.

SCI has moved for summary judgment as to (i) C & D's Counterclaim against it; and (ii) damages for the procurement of inventory necessary to construct 625 rectifiers for C & D.  C & D has moved for summary judgment as to (i) its Counterclaim against SCI; and (ii) Counts I-IV of SCI's Amended Complaint.  As discussed more fully below, the court concludes that material factual disputes preclude the entry of summary judgment in favor of either party with one exception:  the court finds that, as a matter of law, C & D cannot claim damages under § 7-2-712 of Alabama Uniform Commercial Code ("UCC").

## II.    STATEMENT OF FACTS[1]

### A.    Procedural History

On September 25, 2000, SCI and C & D entered into an "Interim Manufacturing Agreement for 24V/150A Modular Switched Mode Rectifier" ("Interim Agreement").  AF No. 1.[2]  In a letter dated September 14, 2001, C & D notified SCI that "C & D [was] terminating the Interim Agreement and the associated C & D purchase order no. P643357-00."  AF No. 2.

SCI filed its Complaint against C & D on July 28, 2003.  (Doc. #1).  The initial pleading included three claims relating to the Interim Agreement:  Count I for breach of contract, Count II for account stated, and Count III for breach of implied contract.  (Doc. #1).  On August 20, 2003, C & D filed its Answer and Counterclaim for breach of the Interim Agreement.  (Doc. #3).  SCI filed its Answer to C & D's Counterclaim (Doc. #7) on September 9, 2003, and filed an Amended Complaint (Doc. #15) on December 12, 2003.  SCI's Amended Complaint included a Count IV for breach of an agreement involving battery cabinets.  (Doc. #15).  C & D filed its Answer to SCI's Amended Complaint (Doc. 16) on December 22, 2003.

---

[1]These are the facts for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[2]The designation "AF" stands for admitted fact and indicates a fact upon which the parties agree by virtue of their written submissions on summary judgment, deposition testimony, or any other evidence offered in support of their position.  As there are cross motions pending, whenever a non-moving party has adequately disputed a fact offered by the other, the court has accepted the non-moving party's version.  The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of SCI's Statement of Facts as set forth in Doc. #27 and responded to by C & D in Doc. #34.  Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

**B.**  **The Parties**

SCI Tech is a contract electronics manufacturer.  AF No. 3.  In 2000 and 2001, both SCI Tech and Sanmina were owned by SCI Systems, Inc.  AF No. 4.  SCI Tech is the North American manufacturing arm of the SCI companies, including Plant 4.  AF No. 5.  Plant 4 is the plant within SCI Tech that worked on the rectifier project for C & D.  AF No. 6.  Sanmina owns Plant 15 in Thailand.  AF No. 7.  In 2000 and 2001, Plant 4 was located in Lacey Springs, Alabama, and Plant 15 in Thailand.  AF No. 9.  Wayne Tucker ("Tucker") is the Plant Manager of Plant 4, and Jim Ferry ("Ferry") is the Plant Manager at Plant 15.  AF No. 10.

C & D is a provider of batteries and power distribution systems for the telecommunications market and other markets that need power sources.  AF No. 11.  At the time of the events forming the basis of the Complaint and Counterclaim, C & D was organized into four divisions; the Standby Power division was the one that sold the rectifiers SCI manufactured.  AF No. 12.  The Standby Power division also supplies DC power for telecommunications and utility switch gear markets.  AF No. 13.

In 2000 through 2001, C & D had eight plants.  AF No. 14.  One of those plants is located in Dunlap, Tennessee.  AF No. 15.  Chuck Wicker ("Wicker") was the Plant Manager of the Dunlap, Tennessee, plant during the time period relevant to the claims and counterclaims in this lawsuit.  AF No. 16.  Two other C & D plants are located in Tucson, Arizona and Nogales, Mexico.  AF No. 17.  During the time period of the Interim Agreement, C & D was involved in the manufacture of rectifiers at these two plants.  AF No. 18.  The Nogales plant manufactured the rectifier and the Tucson plant managed the production of rectifiers.  AF No. 18.

3

### C.    The Rectifier

A rectifier takes in AC and produces DC electricity.  AF No. 19.  The rectifier, which is the subject of the Interim Agreement, was a "switch mode" and was used in the telecommunications industry to power the switches and radios for cell sites, among other things.  AF No. 20.  A rectifier contains seven circuit boards put together within a frame, which is protected with a coated covering.  AF No. 21.  The rectifiers at issue were manufactured with standard components and some special components.  AF No. 22.  The parties agree they are not easy to manufacture.  AF No. 23.  At the time that C & D entered into the Interim Agreement, it was manufacturing the "switch mode" rectifier at its plant in Nogales, Mexico.  AF No. 24.  Sometime in 1999 (or early 2000), C & D began seeking a second source for the rectifier.  AF No. 25.  It was during that period that C & D and SCI first made contact regarding the production of rectifiers.  AF No. 26.

### D.    Negotiations

Chuck Wicker, the plant manager of C & D's Dunlap plant, discussed the possibility of SCI producing rectifiers with Don Ryan ("Ryan"), a sales manager with SCI's Plant 4.  AF No. 27.  Wicker also met with Wayne Tucker, the Plant Manager at Plant 4.  AF No. 28.  Wicker told Ryan that the central issues for C & D were cost, quality, and lead time.  AF No. 29.

The rectifier project was to be a "build to print project."  AF No. 31.  That is, C & D provided SCI with specifications, drawings, and other information needed to manufacture the product, and SCI was to manufacture the product based on the information provided by C & D.  AF No. 32.  C & D provided a Bill of Materials ("BOM") along with a list of all the parts required to manufacture the product, including part numbers and descriptions, revision levels, and quantities used.  AF No. 33.  C & D also provided an Approved Vendors List ("AVL"), which, among other things, supplied SCI

with a list of the vendors who sell the parts listed on the BOM and who have been approved in advance by C & D.  AF No. 34.

Often, the AVL contained multiple approved vendors who each sell a certain part.  AF No. 35.  SCI was to purchase parts from vendors on the AVL, unless SCI received authorization from C & D to deviate from that list.  AF No. 36.  SCI could ask to deviate from the AVL if, for example, SCI could not find a certain part from the vendors listed on the AVL.  AF No. 37.

C & D also supplied SCI with other documents including a complete drawing package, Gerber files, other engineering documents, and test specifications.  AF No. 38.  The complete drawing package included a layout of the entire assembly of the rectifier and showed the placement of the parts for the rectifier.  AF No. 39.  The Gerber files were text-based computer files that described a circuit board and provided enough information about the board so that the board could be reproduced.  AF No. 40.  The test specifications were documents that stated how the product must be tested.  AF No. 41.  In manufacturing the rectifiers, SCI depended on the above information provided by C & D.  AF No. 42.  C & D also gave SCI documentation allowing it to provide a quote on the project.  AF No. 43, 44.  Plant 15 developed the quote for the circuit boards and sent that information to Plant 4, which then put together the final quote and proposal.  AF No. 45.

In fact, Plant 15 manufactured the circuit boards for the rectifiers, and Plant 4 performed the remaining tasks related to the manufacture of the rectifiers.  AF No. 46.  SCI Tech's Plant 4 was responsible for the program supplied by Plant 15, and communicated about the project with C & D.  AF No. 47.  Except for the circuit boards, Plant 4 manufactured, burned in, and delivered the rectifiers to C & D.  AF No. 48.

During the Spring, Summer, and Fall of 2000, Thomas Jackson ("Jackson") of C & D and Alan Estep ("Estep") of SCI negotiated the terms that would govern the business relationship between their companies.  AF No. 49.  Jackson is an associate general counsel for C & D who worked on negotiating and drafting the Interim Agreement on its behalf.  AF No. 50.  Estep is a senior contracts administrator for SCI.  AF No. 51.  They exchanged e-mails and drafts of agreements, and talked to each other over the telephone.  AF No. 49.  The negotiations eventually focused primarily on liability exposure for inventory, including who would be responsible for excess inventory.  AF No. 52.

On September 19, 2000, after their long-distance negotiations had narrowed the open issues, Estep and Tucker went to Blue Bell, Pennsylvania, to meet with C & D regarding the rectifier project.  AF No. 53.  Present at that meeting for C & D were Jackson, Wicker, Dave Fix, and Burney Radecki.  AF No. 54, 55.  While at that meeting, representatives of SCI and C & D discussed various issues regarding the rectifier project.  AF No. 56.  The significant issues discussed during the meeting revolved around inventory procurement and liability for inventory.  AF No. 57.  The "parties talked about what [the] maximum—what [the] respective maximum liabilities would be for inventory."  AF No. 58.  Jackson and Estep also talked about limitations of liability for types of damages.  AF No. 60.  Jackson recalled that "each [party] wanted to limit each other's liability for speculative damages."  AF No. 61.

In Paragraph L of the LOA, SCI and C & D agreed that "[i]n the event of termination for any reason, [SCI] shall use reasonable commercial efforts to minimize [C & D's] liability including, without limitation, canceling all agreements it has entered into and managing material, labor and overhead cost to a minimum."  (Def. Ex. 2 at ¶ L.)  (Estep Dep. at 15-17.)  (Tucker Dep. at 106.)

6

In Paragraph N of the LOA, SCI and C & D agreed that "[n]either party shall make a claim against, or be liable to the other party or its affiliates or agents for any special, punitive, incidental or consequential damages, including, without limitation, lost profits, based upon contract, tort, or any other legal theory."  (Def. Ex. 2 at ¶ N.)  C & D understood that Paragraph N of the Interim Agreement required that, in order for either party to make a claim for damages against the other, that party must in fact have been damaged.  AF No. 63.  After a consensus was reached regarding the central issues, Jackson and Estep went into a room alone and worked on the wording of some of the provisions of the Interim Agreement.  AF No. 64.[3]  To aid them in drafting the Interim Agreement, Jackson and Estep used a combination of two different documents:  SCI's standard agreement and C & D's "tolling agreement."  AF No. 65.  The Interim Agreement was a combination of both of these standard agreements along with terms crafted by the parties' representatives during their drafting session on September 19, 2000.  AF No. 66.

The Interim Agreement was signed by Bernie Radecki ("Radecki") on September 22, 2000, and then sent to SCI.  AF No. 67.  An official of SCI signed the Interim Agreement on September

---

[3]C & D and SCI included a merger clause in Paragraph S of the LOA:

> This LOA together with all Attachments or Exhibits hereto contain the entire agreement between the parties on the subject matter hereto and supersedes all prior and contemporaneous discussions, agreements and understandings of every kind and nature among the parties on the subject matter hereof, except for any related written agreements concerning confidentiality.

(Def. Ex. 2 at ¶ S.)

In Paragraph S of the LOA, SCI and C & D agreed that the terms of the LOA "may be amended only by a writing executed by authorized representative of both parties."  (Def. Ex. 2 at ¶ S.)  (Estep Dep. at 17-18.)

25, 2000.  AF No. 67.  The Purchase Order No. 643357-00 was prepared by C & D, signed by

Radecki on September 20, 2000, and then attached to the Interim Agreement as Attachment A.  AF

No. 68.

       **E.**       **The Terms of the Interim Agreement**

       The Interim Agreement contained several provisions that purport to limit the liability of both

C & D and SCI.  AF No. 69.  In fact, Jackson testified that one of the parties' goals, both during

negotiations and while drafting the Agreement, was to limit the potential liability of both parties.

AF No. 70.  The Interim Agreement contained a provision prohibiting either C & D or SCI from

recovering for lost profits.  AF No. 71.  The Interim Agreement also contained a provision

prohibiting either party from recovering for incidental and consequential damages.  AF No. 72.  The

Interim Agreement and Purchase Order had additional provisions that governed inventory

procurement and liability.  AF No. 74.

       C & D then provided forecasts or releases against the blanket purchase order, and those

forecasts or releases, at a minimum, authorized SCI to procure inventory so that SCI could meet the

delivery dates as set out in the forecast.  AF No. 76.  In Paragraph C of the Interim Agreement, SCI

agreed "to procure the necessary inventory and to manufacture and deliver the Products to [C & D]

according to a schedule which will satisfy [C & D's] rolling 90 day forecast attached hereto as

Attachment C . . . ."  (Def. Ex. 2 at ¶ C.)  (Estep Dep. at 13-14.)  The initial forecast in the Interim

Agreement provided that SCI was to deliver 25 rectifiers in December 2000, and then 575 in January

2001.  AF No. 77.  In Paragraph I of the Interim Agreement, SCI and C & D agreed that SCI's

"shipment of goods must be transacted to arrive 'on time' to the Buyers facility," and that SCI "must

maintain an acceptable 'On-Time Delivery Performance'."  (Def. Ex. 2 at ¶ I.)  On October 11, 2000,

C & D amended the forecast as follows:  25 December '00 for test and approval; 300 January '01, pending approval; 300 February '01, pending approval.  AF No. 78.[4]  Thus, the amended forecast authorized SCI to procure inventory for 625 rectifiers.  AF No. 79.

_____

[4]In Paragraph U of the LOA, SCI and C & D agreed that "[f]ailure of either party to insist on strict performance shall not constitute a waive of any provision of this LOA or waiver of any other default by either party."  (Def. Ex. 2 at ¶ U.)  In Paragraph V of the LOA, SCI and C & D agreed that the LOA would expire on March 31, 2001.  (Def. Ex. 2 at ¶ V.)  (Estep Dep. at 18-19.)

On October 11, 2000, Bob Rogers ("Rogers") included the following paragraph regarding the rectifier forecast in a letter he sent to John Sebastian ("Sebastian") at C & D:

> In accordance with the terms and conditions of the Letter of Agreement (LOA) enclosed, Attachment C (the forecast) needs to be amended to show schedules for the next 90 days beyond the January delivery dates.  This amendment will allow SCI to procure additional material other than the components listed on the 'exceptions list' that David Wilson has provided [*sic*].  Please revise Attachment C and forward to my attention as soon as your time permits.

(Def. Ex. 17.)  (Tucker Dep. at 130-33.)  That same day, on October 11, 2000, Sebastian sent an e-mail to Rogers regarding the rectifier forecast in which he wrote:  "Our forecast breakdown is as follows:  25 December '00 for test and approval; 300 January '01, pending approval; 300 February '01, pending approval.  Further, to our understanding, the blanket purchase order covers your need to procure materials other than those contained in the 'exceptions list'."  (Def. Ex. 17.)  Sebastian's e-mail to Rogers regarding the rectifier forecast was the only revision to the rolling 90 day forecast submitted by C & D to SCI.  (Rogers Dep. at 99, 209.)  On October 13, 2000, Rogers responded to the revised forecast submitted by Sebastian and wrote:

> In the future could you reference in your Email that 'this revised forecast amends previous forecast of Attachment C of LOA' or something to that affect? . . . Also, I plan to reschedule our internal order system to reflect this new forecast.  One of the big things that we as a plant get hit on is inventory carrying charges (something you can appreciate).  Therefore it is my job as Program Manager to limit my exposure to excess inventory, this is why the forecast are so critical!!!

(Def. Ex. 59.)  (Rogers Dep. at 192.)

Notwithstanding the amended forecast, the Interim Agreement provided that SCI was not to underline manufacture any rectifiers until the initial 25 manufactured passed inspection.  AF No. 80.  That process of testing the initial 25 rectifiers before manufacturing any further units is called a "first article approval" agreement.  AF No. 81.  First article approval agreements are common in build to print projects.  AF No. 82.  But even considering that provision of the agreement, under which SCI was not to manufacture any rectifiers beyond the first 25 until those initial rectifiers had passed inspection, the Interim Agreement, as amended by the above-referenced October 11, 2000 e-mail, authorized SCI to procure inventory for all 625 rectifiers, even before the initial 25 rectifiers passed inspection.  AF No. 83.

The parties understood that after the first 625 rectifiers, C & D would make an engineering change for the rectifier, and change some of the parts used on the remaining rectifiers.  AF No. 85.  The parts to be used only in manufacturing the first 600[5] rectifiers were called "at-risk parts."  AF No. 86.  The document that contained the engineering changes that C & D would make to the rectifier after the first 625 was called an Engineering Change Notice ("ECN").  AF No. 87.

### F.   Performance

SCI had never built a rectifier prior to the C & D contract.  (Tucker Dep. at 145.)  On December 12, 2000, SCI failed to deliver 25 rectifiers to C & D.  (Tucker Dep. at 137.)  (Ryan Dep. at 64.)  In connection with the December 2000 delivery date for the initial 25 rectifiers, SCI gave C & D two options:  option one called for C & D to procure some of the components for SCI, which would have allowed SCI to meet the delivery deadline; option two provided that C & D would not

---

[5]Again, the initial forecast calling for 600 rectifiers was amended in October 2000 to provide for the manufacture of 625 units.

help SCI procure the components.  AF No. 89.  C & D was aware that if it chose the second option, that would result in SCI's missing the December 12, 2000 deadline by a couple of weeks.  AF No. 89.  C & D agreed to option two, stating that the delay, "while disappointing, will [not] greatly impact our program."  AF No. 90.  C & D understood at the time of this communication that it had the ability to declare SCI in breach of the contract, but C & D opted not do that.  AF No. 91.

On December 8, 2000–four days before the December 12, 2000 delivery date–C & D helped SCI obtain information about engineering documents provided by C & D to SCI.  AF No. 92.  SCI indicated it needed the information about those engineering documents to manufacture the rectifier.  AF No. 93.  The delay was longer than a couple of weeks; SCI did not deliver the first 25 rectifiers by January 2001.  AF No. 94.[6]

Jackson, C & D's associate general counsel, was aware that SCI did not deliver the 25 rectifiers by December 12, 2000, and 300 by January 2001.  AF No. 97.  Even though SCI missed those delivery dates, in January 2001, C & D still wanted SCI to deliver the initial 25 rectifiers and the additional rectifiers.  AF No. 98.  In fact, on January 9, 2001, C & D asked SCI if "procurement of components is going to be an ongoing issue beyond the first 625?"  AF No. 99.

Further, on March 7, 2001, three months after the initial 25 rectifiers were due and two months well after the delivery dates under the amended forecast for the other 600 rectifiers, C & D provided SCI with a list of substitute parts that SCI could order in the place of ones listed on the BOM and the AVL which C & D had provided.  AF No. 100.  SCI indicated it needed that list of substitute parts so that it could procure parts needed to manufacture the rectifiers, because SCI

---

[6]Nor did SCI deliver the next 300 rectifiers by January 2001, as the updated forecast had provided.  AF No. 95.

believed that some of the parts on C & D's BOM and AVL were not available on the market.   AF No. 101.

In March 2001, C & D was fully aware that SCI was three months late delivering the first 25 rectifiers and according to the forecast, one to two months late delivering the other rectifiers.   AF No. 102.   Nevertheless, C & D did not terminate the Interim Agreement.   AF No. 103.   Instead, in March 2001, C & D continued to authorize SCI to purchase parts from vendors not listed on the initial AVL.   AF No. 104.   As of March 2001, C & D still wanted SCI to manufacture the 25 rectifiers that, according to the Interim Agreement, were due in December 2000.   AF No. 105.   As of March 2001, C & D had not informed SCI that it intended to terminate the contract because SCI had failed to deliver any rectifiers, including the 25 initial ones scheduled for delivery for testing on December 12, 2000.   AF No. 106.[7]

On April 2, 2001, C & D asked SCI for the current build schedule for the first 25 rectifiers. AF No. 108.   In that April 2001 e-mail communication, John Sebastian of C & D wrote to Bob Rogers of SCI: "What's the status?   Still looking like mid April?"   AF No. 109.   Rogers responded: "The middle of April is still looking like a possibility."   AF No. 110.   By April 2001, C & D had informed SCI that its engineers wanted to visit SCI's plant before the first 25 units were shipped.

---

[7]On March 20, 2001, SCI sought an extension of the LOA by sending C & D a draft "Amendment #1" to the Interim Agreement.   (Estep Dep. at 23-24.)   (Def. Ex. No. 4.)   In "Amendment #1," SCI requested an extension of the Interim Agreement from March 31, 2001, until October 31, 2001.   (Def. Ex. No. 4.)   C & D never signed an agreement to extend the termination date in Paragraph V of the Interim Agreement.   (Estep Dep. at 25-26.)   SCI and C & D did not enter into a Manufacturing Agreement.   (Tucker Dep. at 196.)   (Def. Ex. 35.)   On May 17, 2001, SCI e-mailed C & D and asked it "extend the [Interim Agreement] such that SCI can continue as [*sic*] a supplier to C & D."   (Def. Ex. 35.)   (Tucker Dep. at 197-99.)   C & D declined to enter into an agreement extending the Interim Agreement.   (Tucker Dep. at 196-97.)   The Interim Agreement was the only written contract pertaining to the rectifiers signed and executed by SCI and C & D.   (Estep Dep. at 26-27.)   (Tucker Dep. at 94, 106-07.)   (Rogers Dep. at 124, 149.)

AF No. 111.  As of April 2, 2001, C & D still wanted SCI to produce the initial 25 rectifiers, even though SCI had missed the December 12, 2000 delivery date (as well as every other delivery date contemplated in the Interim Agreement and in the October 12, 2000 Amendment to Attachment C of the Interim Agreement).  AF No. 112.

As of April 3, 2001, C & D was still communicating with SCI and providing SCI with substitute parts that SCI was authorized to procure in the place of other parts (which SCI believed were unavailable) on C & D's BOM and AVL.  AF No. 113.  On April 3, 2001, C & D again updated the AVL, adding a vendor to that list at the request of SCI.  AF No. 114.  On April 10, 2001,  after SCI reported that it believed that two parts were obsolete, C & D  again communicated with SCI regarding the rectifiers, offering a substitute part for one of those two parts.  AF No. 115.

As of April 2001, C & D still wanted SCI to deliver 25 rectifiers.  AF No. 116.  In fact, C & D had "on-going conversations" with SCI throughout April, May, and June 2001 that involved discussing C & D's desire to get the first 25 units and the date that SCI could deliver them.  AF No. 117.  On April 18, 2001, C & D's Wicker informed SCI not to "purchase any inventory beyond the purchase order of 625 units" but that SCI should still ship the initial 25 units to Dunlap for Engineering Evaluation when it was finished with them.[8]  AF No. 120, 121; PX 26.  Wicker also stated that SCI could "[e]xpect that [C & D] will take delivery of the 600 units over some period of time to be determined after Engineering signs off on the first 25."  AF No. 118.  In that same e-mail

---

[8]Although the Interim Agreement provided that the initial 25 rectifiers originally scheduled for delivery on December 12, 2000 had to be approved by C & D before the manufacture of any other rectifiers, Plant 4's program manager did not insert that rotation into SCI's inventory management system, (Rogers Dep. at 75) and never entered the "after approval language" into its system. (Maddox Dep. at 93.)  There were many other errors made with respect to data entry into SCI's inventory management system.

on April 18, 2001, C & D told SCI to "[e]xpect that to take six weeks after delivery" and asked SCI to "provide a list of the eleven parts you found obsolete." AF No. 119.

On April 24, 2001, SCI informed C & D that the final two boards from Plant 15 were due to arrive at Plant 4 that day: "The final two boards will be here today. Bob [Rogers, program manager at SCI] will be asking Dave [Wilson, an engineer at C & D] to come visit for the testing of the first group. I would like to invite you [Chuck Wicker] down when we are ready to ship our first unit." AF No. 122. To that, Wicker responded: "What, for a party! 5 months is long wait to get this, make sure it works!" AF No. 123.

In fact, on April 26, 2001, C & D provided SCI with a list of the engineering changes that would be made to the rectifier after SCI had manufactured the first 625 units. AF No. 124. On May 1, 2001, C & D again responded with an answer to a question that SCI had about the BOM. AF No. 125. On May 14, 2001, SCI delivered and C & D accepted 12 of the initial 25 rectifiers. AF No. 126.

On May 17, 2001, although C & D refused a request from SCI for a permanent deviation from the BOM and AVL for certain parts, C & D stated that it would wait to decide ultimately what to do about the request after the first 25 rectifiers passed inspection communication, indicating that it "was more inclined to pursue a deviation for 6000 rectifiers." AF No. 127. On May 18, 2001, C & D again responded to SCI's request for additions to the AVL. AF No. 128.

Although C & D had an "on-going discussion" internally about cancelling the Interim Agreement during the Spring 2001, and a C & D official stated on May 23, 2001, that he believed C & D had the right to cancel the agreement, C & D did not inform SCI at that time that the Interim

Agreement was canceled.  AF No. 129.  Jackson, C & D's associate general counsel, was aware that, as of May 2001, C & D had a "right" to cancel the agreement.  AF No. 130.

On May 30, 2001, SCI delivered and C & D accepted four more of the initial 25 rectifiers.  AF No. 131.  On June 14, 2001, SCI delivered and C & D accepted an additional four rectifiers.  AF No. 134.  Thus, by July 2001, SCI had delivered all but five of the initial 25 rectifiers.  AF No. 135.

SCI believed that it could not obtain several parts on the market that it needed to manufacture the remaining five rectifiers.  AF No. 136.  SCI asked C & D to help find those parts.  AF No. 137.  C & D provided SCI with three of the parts SCI needed to manufacture the remaining five rectifiers.  AF No. 138.  On August 7, 2001, SCI delivered and C & D accepted four more of the initial 25 rectifiers.  AF No. 139.  Later in July 2001, C & D provided SCI with the last component SCI needed to manufacture the final rectifier.  AF No. 140.  C & D accepted delivery of that, the last of the 25 initial rectifiers, on August 17, 2001.  AF No. 141.

### G.    Termination of the Interim Agreement

In a letter dated September 14, 2001, C & D informed SCI that it was terminating the Interim Agreement and Purchase Order.  AF No. 142.  C & D's purpose in sending the September 14, 2001 letter was to "end our relationship to that agreement."  AF No. 143.  This was the first letter of termination that C & D sent SCI.  AF No. 144.

As C & D explained in its September 2001 letter, C & D was terminating the agreement because SCI had not delivered according to the dates in the Interim Agreement:

> As you know, the terms of the Interim Agreement provided that SCI was to delivery twenty-five 24/150 rectifiers for the first article inspection by December 12, 2000.  Assuming those units passed inspection, an additional 575 units were to be delivered by December 31, 2001.  Shortly following the signing of the Interim

> Agreement, SCI revised the delivery date of these units to January 2001. Later in February, despite our objection, we were notified by SCI that the delivery date was again being postponed until April 15, 2001. A partial shipment of twelve units was not received until 5/14/01. The remaining sixteen units were received as follows: Four on 5/30/01, four 6/14/01, four 8/7/01, and the final unit was not delivered until Friday, August 17, 2001. That is more than eight months after the initially agreed delivery date. By any standard, SCI's performance in this regard is wholly unacceptable and tantamount to breach of the Interim Agreement.

AF No. 146. On February 4, 2003, after SCI had invoiced C & D for excess inventory, C & D restated its position that it canceled the Interim Agreement pursuant to the September 14, 2001 letter because of a "material failure to perform." AF No. 147.

**H.      SCI's Excess Inventory**

At the time that C & D terminated the Interim Agreement, SCI had delivered 25 rectifiers. AF No. 148. In January 2002, five months after it terminated the Interim Agreement and Purchase Order, C & D released SCI to produce another 200 rectifiers. AF No. 149. The release was against the same Purchase Order that C & D said it was terminating in the September 14, 2001 letter. AF No. 150.

SCI delivered and C & D accepted those 200 rectifiers. AF No. 151. In total, before this litigation commenced, SCI had manufactured and delivered a total of 245 rectifiers to C & D. AF No. 152. After this lawsuit commenced, SCI delivered another 20 rectifiers to C & D. AF No. 153. SCI still has on hand a certain amount of excess inventory it procured while performing under the Interim Agreement. AF No. 154. Some of that inventory are components remaining on hand which were purchased to build the first 625 rectifiers. AF No. 155.

16

I.      **C & D's Damages**

During the entire period from September 25, 2000 to September 14, 2001, C & D continued manufacturing rectifiers "in-house" at its plants in Nogales, Mexico, and Tucson, Arizona. AF No. 157. During the period covered by the Interim Agreement, C & D had enough rectifiers to meet its demand. AF No. 158. That is, SCI's failure to deliver the forecasted amount of rectifiers did not cause C & D to come up short on rectifiers. AF. No. 159. That was because C & D continued producing rectifiers at its Nogales plant in sufficient quantity to meet its demand. AF No. 159.

C & D had planned to reduce the number of rectifiers that its Nogales plant would produce when SCI began delivering rectifiers after the initial 25 passed inspection. AF No. 160. When SCI failed to deliver any rectifiers beyond the initial 25, C & D–before terminating the Interim Agreement–opted not to reduce the number of rectifiers manufactured in Nogales. AF No. 161. In fact, during Spring 2001, C & D had internal company communications regarding the production of rectifiers and C & D's decision about how to "integrate the mix"[9] between Nogales and SCI. AF No. 162.

In April 2001, the Plant Manager of the Tucson plant asked C & D officials to send more of the rectifier business to them, instead of reducing their number of rectifiers and allowing SCI to produce those rectifiers. AF No. 164. The Plant Manager in Tucson wrote that, "due to the low demands of [his] marketplace," he would like for Nogales to produce more rectifiers. AF No. 165. The Tucson and Nogales plants wished to produce more rectifiers, and Wicker and others at C & D

---

[9]By "integrate the mix," C & D meant the number of rectifiers SCI produced and the number Nogales produced. AF No. 163.

agreed that the "home team"[10] would get the rectifier business and that C & D would "proceed on a slower track with SCI."  AF No. 166.  From September 2000 through September 2001, C & D had enough rectifiers to meet its demand.  AF No. 168.  In fact, C & D did not lose any contract with a customer or potential customer because of SCI's failure to meet the delivery dates set out in the Interim Agreement.  AF No. 169.

C & D's only Rule 30(b)(6) deponent designated as to its damages was Rich Fedyk ("Fedyk").  AF No. 170.  Fedyk testified that during the time period of the Interim Agreement, *i.e.*, from December 2000 through December 2001, "[t]o the best of my knowledge, I didn't lose any business."  AF No. 170.  During that same time frame, C & D shipped all the rectifiers that its customers had ordered.  AF No. 171.  Fedyk also testified that during that period of time C & D delivered rectifiers that its customers considered "late", however, he also admitted that C & D's customers paid full market price for those rectifiers and have continued to do business with C & D.  AF No. 172.  Indeed, C & D cannot point to one instance in which a customer contracted with a competitor of C & D for rectifiers because of C & D's late delivery or because C & D did not have enough rectifiers to sell.  AF No. 173.

## III.    STANDARD ON SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking

---

[10]By the "home team," C & D meant that Nogales would be allowed to produce more of the total number of rectifiers that C & D needed a month than C & D had initially contemplated when entering into the Interim Agreement with SCI.  AF No. 167.

for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

## IV.   ANALYSIS

The parties are in agreement that Alabama's version of the UCC applies to their claims. In accordance with § 7-1-103, when a particular term or provision is not addressed by the UCC, the court will look to Alabama common law to supply the legal rule.

The court has reviewed the parties' submissions and concludes, for the reasons stated below, that with one exception, material issues of fact exist in this case that must be resolved by a jury. The single exception relates to C & D's damages claim under Ala. Code § 7-2-712. With respect to that claim, SCI is due summary judgment.

A.     **C & D's Damages Under § 7-2-712**

The parties do not dispute that C & D took actions to cover by purchasing rectifiers from Nogales in substitution for the ones that it did not receive from SCI.  Nogales was the only location from which C & D obtained substitute rectifiers.  Further, it is undisputed that the cost of those substitute rectifiers which C & D acquired from Nogales was the same amount as the rectifiers it would have acquired from SCI.  Also, there is no dispute that C & D did not lose any business, contracts, or profits due to a lack of a supply of rectifiers.

Section 7-2-712 explains a buyer's remedy of cover and provides:

(1) After a breach within Section 7-2-711, the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 7-2-715), but less expenses saved in consequence of the seller's breach.

(3) Failure of the buyer to effect cover within this section does not bar him from any other remedy.

Section 7-2-715 addresses a buyer's right to incidental and consequential damages as a result of a seller's breach:

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include:

(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

20

(b) Injury to person or property proximately resulting from any breach of warranty.

Based upon the evidence submitted on summary judgment,[11] the court is persuaded that C & D cannot recover any damages under § 7-2-712 as a matter of law.

In opposing summary judgment for SCI on this issue, C & D points to the testimony of Fedyk about C & D's spot sales of rectifiers to customers for the months of December 2000 and January 2001 (Doc. #34 at 10 ¶ 7) and urges the court to utilize the calculation of damages for non-delivery of goods provided in § 7-2-713—the difference between the market price and the contract price together with any incidental or consequential damages, and reduced by any expenses saved.  That argument is off the mark.

Here C & D voluntarily (and undisputedly) elected to procure substitute rectifiers.  Therefore, C & D's damages are governed by § 7-2-712.  As stated in the Official Comments to § 7-2-712:

> Subsection (3) expresses the policy that cover is not a mandatory remedy for the buyer. The buyer is always **free to choose between** cover and damages for non-delivery under the next section.

Official Comments to § 7-2-712 at ¶ 3 (emphasis added).  The express formula under § 7-2-712 is the difference between the cost of cover and the contract price.  Accordingly, spot sales and general market prices have no bearing on determining the cover remedy.  Moreover, C & D has conceded that it is not entitled to recover any incidental or consequential damages as a result of purchasing the substitute rectifiers from Nogales, which would impact the cover calculation—instead, C & D acknowledges that the substitute transaction was essentially an even exchange and that, regardless,

---

[11]As correctly pointed out by SCI, C & D's belated efforts to submit affidavit testimony that contradicts prior deposition testimony in order to create a material factual dispute as to its claim for damages is wholly ineffective by virtue of the rule in *Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656 (11th Cir. 1984).

the Interim Agreement excludes that particular category of damages.  Accordingly, SCI's Motion for

Summary Judgment is due to be granted with respect to C & D's claim for damages under § 7-2-712

of the Alabama Code.[12]

### B.      Issues Relating to Waiver

At the heart of both parties' summary judgment arguments is the issue of whether there was

a waiver *vel non* of the delivery deadlines in the Interim Agreement.  Section 7-2-209 addresses the

modification, rescission, and waiver of commercial agreements:

> (1) An agreement modifying a contract within this article needs no consideration to
> be binding.
>
> (2) A signed agreement which excludes modification or rescission except by a signed
> writing cannot be otherwise modified or rescinded, but except as between merchants
> such a requirement on a form supplied by the merchant must be separately signed by
> the other party.
>
> (3) The requirements of the statute of frauds section of this article (Section 7-2-201)
> must be satisfied if the contract as modified is within its provisions.
>
> (4) Although an attempt at modification or rescission does not satisfy the
> requirements of subsection (2) or (3) it can operate as a waiver.
>
> (5) A party who has made a waiver affecting an executory portion of the contract may
> retract the waiver by reasonable notification received by the other party that strict
> performance will be required of any term waived, unless the retraction would be
> unjust in view of a material change of position in reliance on the waiver.

---

[12]The court reserves for trial the issue of whether C & D is entitled to recover for nominal damages pursuant to SCI's alleged breach of the Interim Agreement.  *See, e.g., Wade McHenry Lumber Co. v. Frank Spangler Co.*, 230 F. 418, 420 (5th Cir. 1916) ("And if the expense of so obtaining from another source the lumber as called for by the contract was less than the plaintiff would have been subjected to if the contract had been complied with, it was benefitted, instead of being harmed, by the breach complained of.  In that event, while the breach of the contract entitled plaintiff to a verdict in its favor, only nominal damages were allowable.").  At this juncture, the court finds that, as a matter of law, the most that C & D is entitled to recover pursuant to its Counterclaim is nominal damages.  *See* Doc. #47 at 7 n.4.

*Id.*

Alabama common law defines waiver as the intentional relinquishment of a known right.

*Bell v. Birmingham Broadcasting Co.*, 82 So.2d 345 (Ala. 1955).

> While it is to be conceded that intent necessary to constitute waiver may be implied from the act of the party involved, the inquiry still is what was the intent of the party as manifested by his actions.

*Bell*, 82 So. 2d at 347. "Furthermore, '[a]n intention to waive a right may be found where one's course of conduct indicates the same or is inconsistent with any other intention.'" *Id.* (citation omitted).

In *BMC Industries, Inc. v. Barth Industries, Inc.*, 160 F.3d 1322 (11th Cir. 1998), the Eleventh Circuit, in analyzing the application of Florida's Uniform Commercial Code provisions, recognized that while waiver is generally a question of fact, a buyer may waive missed delivery dates as a matter of law when the underlying facts are not in dispute. *Id*. at 1335. Moreover, waiver may be established through conduct alone, and a written modification of the contract which excuses late or nonperformance is not essential. *See Commercial Contractors, Inc. v. United States Fidelity & Guaranty Co.*, 524 F.2d 944, 954 (5th Cir. 1975) (applying Alabama common law and stating that "'[w]here the party to whom delivery has not been made within the time stipulated does not treat the contract as breached, but evidences to the other party thereto, a purpose to continue it in force, or to reserve to himself the right to insist on its further performance at some future time, he waives the time limit, and for a reasonable time thereafter the respective parties are bound by the terms of the contract'") (citation omitted).

Another consideration in this case, however, is that under Alabama law, "a waiver requires the intentional relinquishment of a known right, and that intentional relinquishment must be shown

23

in an unequivocal manner." *Putnam Constr. & Realty Co. v. Byrd*, 632 So. 2d 961, 965 (Ala. 1992); *Braswell Wood Co. v. Fussell*, 474 So.2d 67, 74 (Ala.1985) (finding that intent to waive remedy is jury issue and reasoning that "[a]s with the defense of release, we cannot say as a matter of law that Fussell did not intend to waive his right to bring an action in conversion against Braswell Wood. Here again, intention is appropriately an issue for the jury.").

SCI relies heavily on the *BMC* decision.  That case involved an estimated one and one half years of additional time spent by the seller attempting to fulfill the contract after missing the original shipment date of October 1987.  This lawsuit involves a significantly smaller interval of eight months.  Also, the seller in the *BMC* decision was prepared to make full and complete delivery under the contract at the time the buyer sued for breach, while SCI still had two sizable shipments (*i.e.,* 300 rectifiers in each shipment) to build and deliver to C & D.[13]  Those shipments were already overdue under the Interim Agreement.

Based upon the undisputed facts underlying these motions (and upon which the parties have agreed solely for the purpose of summary judgment), triable material issues exist as to whether C & D's actions constitute an unequivocal waiver of the Interim Agreement's delivery dates.  Put differently, the court is persuaded that (1) a reasonable jury could conclude that SCI has carried its burden of demonstrating waiver as a matter of law, but (2) that same reasonable jury could conclude

---

[13]It will also be incumbent upon the jury to determine–based on the agreement's language and the parties' conduct–what requirement SCI had to make to two subsequent shipments of rectifiers. The Interim Agreement and the amended forecast contemplated that C & D would approve the initial 25 rectifiers and thereafter SCI would make two shipments for a total of 600 rectifiers (300 in each shipment) to C & D.  There is evidence that SCI never entered this first article approval requirement into its inventory management system.  It is also unclear, in light of the delay in shipment of the initial 25 rectifiers (and if there was not a waiver by C & D) when C & D could reasonably expect the subsequent 300 rectifiers' shipments in light of the agreement's language and the parties' discussion (or lack thereof) about forecasts.

that it has not.  *See Hammer v. Rock Mountain Lake, Inc.*, 451 So. 2d 249, 251 (Ala. 1984) ("Of course, whether there was a waiver of strict compliance is a question of fact, the burden of proof resting upon the party relying upon waiver.") (citation omitted).

Therefore, because the court concludes that material factual disputes exist concerning whether C & D waived SCI's delay in performance, summary judgment is not appropriate for either SCI or C & D as it relates to the substance of C & D's Counterclaim for breach of the Interim Agreement.  As stated by the Eleventh Circuit, "'[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment.'"  *Cox*, 17 F.3d at 1396 (quoting *Barfield v. Brierton*, 883 F.2d 923, 933-34 (11th Cir.1989)).

Similarly, SCI is not entitled to partial summary judgment on the issue of damages relating to the inventory for the 625 rectifies in the event of a termination of the Interim Agreement.  First, because the analysis of C&D's termination of the Interim Agreement is substantially intertwined with whether a breach of the Interim Agreement took place (as opposed to non-compliance and a subsequent waiver), summary judgment is inappropriate on this aspect of SCI's Motion for Summary Judgment.  Second, even if SCI can establish a breach by C & D, a trier of fact must determine whether SCI's damages are related to its own alleged errors, including but not limited to problems associated with its entry of data into its inventory management system.

Likewise, C & D is not entitled to summary judgment in this case.  Because there is a substantial issue related to waiver, C & D is unable to establish that it is entitled to judgment as a matter of law on SCI's breach of contract, open account, and breach of implied contract claims pertaining to the Interim Agreement.  As to Count IV of the Amended Complaint, which relates to

the parties' battery cabinet sale and purchase agreement,[14] material factual gaps and/or disputes relating to the circumstances surrounding the formation and termination of this arrangement preclude the entry of summary judgment in favor of C & D.

## V.      CONCLUSION

Accordingly, based upon the above analysis, the court will enter an order granting in part and denying in part SCI's Motion for Summary Judgment and denying C &D 's Motion for Summary Judgment.  More specifically, the court will grant summary judgment in favor of SCI as it pertains to C & D's claim for damages under § 7-2-712 of the UCC.  The court will deny each party's motion for summary judgment on all other grounds, due to the presence of material factual disputes that preclude the entry of judgment as a matter of law.

**DONE** and **ORDERED** this _____4th_____ day of November, 2005.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[14]The court has reviewed C & D's evidentiary submission regarding this claim and concludes a trier of fact must determine what occurred between the parties.